**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

```
JOSEPH D. W.,                   )
                                )
            Plaintiff,          )
                                )
      v.                        )        1:23CV863
                                )
MARTIN J. O'MALLEY,             )
Commissioner of Social          )
Security,                       )
                                )
            Defendant.¹         )
```

**MEMORANDUM OPINION AND ORDER**
**OF UNITED STATES MAGISTRATE JUDGE**

Plaintiff, Joseph D. W., brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Commissioner of Social Security (the "Commissioner"), denying Plaintiff's claim for Disability Insurance Benefits ("DIB"). (Docket Entry 1.) The Commissioner has filed the certified administrative record (Docket Entry 3 (cited herein as "Tr. __")), Plaintiff has moved for summary judgment (Docket Entry 6; see also Docket Entry 7 (Supporting Memorandum)), and the Commissioner has submitted a dispositive brief in accordance with Rule 5 of the Supplemental Rules for Social Security Actions under 42 U.S.C. § 405(g) (Docket Entry 9).

---

[1] On December 20, 2023, President Joseph R. Biden, Jr., appointed Martin J. O'Malley as Commissioner of the Social Security Administration. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin J. O'Malley should substitute for Kilolo Kijakazi as Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

For the reasons that follow, the Court will enter judgment for the Commissioner.[2]

## I. PROCEDURAL HISTORY

Plaintiff applied for DIB (Tr. 176-78, 183-86), originally alleging a disability onset date of May 28, 2019 (<u>see</u> Tr. 176), but later amending the onset date to November 20, 2020 (<u>see</u> Tr. 185), likely due to earnings at substantial gainful activity levels between May 28, 2019, and November 20, 2020 (<u>see</u> Tr. 188, 230). Upon denial of that application initially (Tr. 57-66, 81-85) and on reconsideration (Tr. 67-80, 92-101), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 102-03). Plaintiff, his attorney, and a vocational expert ("VE") attended the hearing. (Tr. 39-56.) The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act. (Tr. 17-38.) The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-7, 173-75, 327-28), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that decision, the ALJ made the following findings later adopted by the Commissioner:

1. [Plaintiff] meets the insured status requirements of the . . . Act through December 31, 2025.

2. [Plaintiff] has not engaged in substantial gainful activity since November 20, 2020, the alleged onset date.

---

[2] On consent of the parties, "this case [wa]s referred to the [undersigned] United States Magistrate Judge . . . to conduct all proceedings . . ., to order the entry of judgment, and to conduct all post-judgment proceedings []herein." (Docket Entry 10 at 1.)

. . .

3. [Plaintiff] has the following severe impairments: gastrointestinal disorder; anxiety disorder; and depressive disorder.

. . .

4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

5. . . . [Plaintiff] has the residual functional capacity to perform medium work . . . except frequent ramps and stairs; occasional ladders, ropes, and scaffolds. [He] should avoid concentrated exposure to hazardous conditions, such as unprotected heights and dangerous machinery. [He] can understand, remember and carry out simple instructions. He can interact with supervisors and co-workers frequently, but never interact with the general public. [He] can tolerate infrequent and gradually introduced changes in the workplace.

. . .

6. [Plaintiff] is unable to perform any past relevant work.

. . .

10. Considering [Plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [he] can perform.

. . .

11. [Plaintiff] has not been under a disability, as defined in the . . . Act, from November 20, 2020, through the date of this decision.

(Tr. 22-30 (bold font, and internal parenthetical citations omitted).)

3

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of . . . review of [such a] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). Plaintiff has not established entitlement to relief under the extremely limited review standard.

### A. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal brackets and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the

4

case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id.

5

(quoting 42 U.S.C. § 423(d)(1)(A)).[3] "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . promulgated . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id. (internal citations omitted).

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity [('RFC')] to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[4] A finding adverse to the claimant at any of several points in the SEP forecloses an award

---

[3] The Act "comprises two disability benefits programs. [DIB] . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

[4] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [government] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

6

and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's [RFC]." Id. at 179.[5] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering

---

[5] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

7

both [the RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[6]

## B. Assignments of Error

Plaintiff asserts that the Court should overturn the ALJ's finding of non-disability on these grounds:

1) "[t]he ALJ's findings regarding Plaintiff's [RFC] limitations were not supported by substantial evidence" (Docket Entry 7 at 3 (bold font, all caps font, and block formatting omitted));

2) "[t]he ALJ erred by failing to consider [Plaintiff]'s absentee rate in concluding jobs exist[ed] in significant numbers that [he] could perform" (id. at 6 (bold font, all caps font, and block formatting omitted)); and

3) "[t]he ALJ failed to comply with 20 [C.F.R.] § 404.1520[c] in not according adequate weight to the opinions of Dr. Tammie

---

[6] A claimant thus can qualify as disabled via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

Gainey, Plaintiff's treating physician [sic]" (id. at 9 (bold font, all caps font, and block formatting omitted)).[7]

Defendant contends otherwise and seeks affirmance of the ALJ's decision. (See Docket Entry 9 at 3-17.)

### 1. State Agency Psychological Consultants' Opinions

In Plaintiff's first issue on review, he argues that "[t]he ALJ's findings regarding Plaintiff's [RFC] limitations were not supported by substantial evidence." (Docket Entry 7 at 3 (bold font, all caps font, and block formatting omitted).) More specifically, Plaintiff maintains that "[t]he ALJ credited the psychiatric review technique by the [s]tate [a]gency [m]edical [sic] [c]onsultants . . ., but did not incorporate all of their [RFC] limitations in [Plaintiff]'s [RFC] analysis." (Id. (citing Tr. 24-25, 64).) In particular, Plaintiff contends that the ALJ should have included in the RFC the consultants' 1) opinion regarding Plaintiff's "inability to 'accept instructions and respond appropriately to criticism from supervisors,'" 2) "limitation to non-production work," and 3) "limitation[] in ability to maintain attention and concentration for extended periods." (Id. at 4 (quoting Tr. 64).) According to Plaintiff, "[t]he ALJ did not explain why [he] excluded [those] limitations . . . from the RFC" (id.) and, given that the opinion

---

[7] The record reflects that Tammie Gainey holds a Ph.D. and two nursing certifications, but does not indicate that she has obtained a Doctor of Medicine degree. (See Tr. 965.)

of Dr. Gainey, "supported significant limitations in the [same] categories [of mental functioning]" (id. (citing Tr. 966)), "no competent medical expert opinion [existed] contrary to the[ consultants'] restrictions" (id.). Plaintiff thus urges that "[t]he RFC, as adopted by the ALJ, does not recognize Plaintiff's inability to do the production job of [b]oxmaker ([Dictionary of Occupational Titles ('DOT') No.] 794.684-014), nor his inability to accept instruction or interact appropriately with supervisors, as is likely required by [the jobs of i]ndustrial [c]leaner ([DOT No.] 381.687-018), [l]andscape [s]pecialist ([DOT No.] 406.687-010) and [b]oxmaker ([DOT No.] 794.684-014)." (Id. (citing Tr. 24-25).) For the reasons that follow, those arguments miss the mark.

The state agency psychological consultants both found that Plaintiff had severe depression and anxiety, which did not meet or medically equal any listing, but did result in moderate limitation in his abilities to interact with others, concentrate, persist, or maintain pace ("CPP"), and adapt or manage himself. (See Tr. 61, 72.) As far as Plaintiff's mental RFC, both consultants (A) opined that, overall, Plaintiff remained capable of simple, routine, and repetitive tasks ("SRRTs") (see Tr. 62, 77), and (B) observed that Plaintiff could "sustain concentration and attention for simple tasks on an ongoing basis with [the] caveat that [an] occasional anxiety reaction w[ould] disrupt task focus for a short period" (Tr. 64, 76), "adequately relate to others in a work setting on a

casual basis" (id.), and "adapt to routine changes and tolerate low stress in a nonproduction work setting" (id.).

The ALJ's analysis of those opinions follows:

> As for the opinion evidence regarding [Plaintiff]'s mental functioning, the [ALJ] considered the psychiatric review technique set forth by [the state agency psychological consultants]. ([Tr. 58-79]). [The consultants] opined mostly moderate limitations [in the] paragraph B criteria, and further opined that [Plaintiff] retains the capacity to sustain concentration and attention for simple tasks, occasional anxiety reaction will disrupt task focus for a short period, can adequately relate to others in a work setting on a casual basis, and can adapt to routine changes and tolerate low stress in a nonproduction work setting. This opinion was supported by therapy records, [and] reported activities of daily living. ([Tr. 64, 72]). This opinion is generally consistent with the evidence at the hearing level showing [Plaintiff]'s ongoing treatment for complaints of anxiety, panic attacks, and depression, but largely normal mental status findings including logical thought process, normal thought content, fair insight, normal recent and remote memory, normal attention span and concentration ability, good eye contact, and well groomed. ([Tr. 2100, 2102, 2105, 2107, 2151, 2154, 2164, 2319]).

(Tr. 28 (emphasis added).)

As an initial matter, and contrary to Plaintiff's allegations, the ALJ did not fully credit the consultants' opinions. The ALJ noted that he found the consultants' opinions "generally consistent with the evidence at the hearing level" (id. (emphasis added)), and also noted that they "opined mostly moderate limitations [in the] paragraph B criteria" (id. (emphasis added); see also Tr. 61, 72 (consultants' opinions finding moderate limitation in Plaintiff's abilities to interact with others, maintain CPP, and adapt or

manage himself)), whereas the ALJ found only <u>mild</u> limitation in Plaintiff's ability to <u>maintain CPP</u> (<u>see</u> Tr. 24). Thus, the ALJ's own analysis signals that he did not intend to adopt in full the consultants' opinions. However, even assuming, <u>arguendo</u>, that the ALJ had found the consultants' opinions fully persuasive, Plaintiff still could not show prejudicial error by the ALJ for the following three reasons.

First, Plaintiff's assertion that the ALJ should have included in the RFC the consultants' moderate limitations on Plaintiff's abilities to accept instructions and respond appropriately to criticism from supervisors and to maintain attention and concentration for extended periods (<u>see</u> Docket Entry 7 at 4 (referencing Tr. 64, 76)) lacks merit. The consultants' moderate limitations in question appear in the portion of the mental RFC form which the consultants use as "merely a worksheet to aid in deciding the presence and degree of functional limitations . . . and does not constitute the RFC assessment." Program Operations Manual System ("POMS") DI 24510.060B.2.a (bold font omitted). The consultants assess the actual mental RFC in the <u>narrative</u> portion of the form. <u>See</u> POMS DI 24510.060B.4. Here, despite finding moderate limitations in Plaintiff's abilities to handle a supervisor's instructions/criticism and to maintain attention/concentration, and as the ALJ recognized (<u>see</u> Tr. 28), the consultants concluded in the <u>narrative</u> portion of the mental RFC

12

form that Plaintiff could "sustain concentration and attention for simple tasks on an ongoing basis with [the] caveat that [an] occasional anxiety reaction w[ould] disrupt task focus for a short period" and "adequately relate to others in a work setting on a casual basis" (Tr. 64, 76).  The ALJ did not err by relying on the consultants' narrative mental RFC assessment.  See Jones v. Commissioner of Soc. Sec., 478 F. App'x 610, 612 (11th Cir. 2012) (rejecting the claimant's contention that ALJ should have accounted in RFC for moderate limitations identified on mental RFC assessment form, and noting that limitations "are only part of a worksheet that does not constitute the doctors' actual RFC assessment" (brackets and internal quotation marks omitted)); Smith v. Commissioner of Soc. Sec., 631 F.3d 632, 636-37 (3d Cir. 2010) (finding no error where ALJ did not include in hypothetical question to VE moderate limitations contained in worksheet part of mental RFC form, and concluding that the claimant could not "rely on the worksheet component" of that form); Johansen v. Barnhart, 314 F.3d 283, 288-89 (7th Cir. 2002) (upholding ALJ's reliance on narrative mental RFC assessment rather than subsidiary findings of moderate limitations in the claimant's ability to maintain regular schedule and attendance and to complete normal workday and workweek).

Second, Plaintiff has not shown that the ALJ's inclusion in the RFC of the consultants' limitation to nonproduction jobs would

13

eliminate all three of the jobs cited by the VE in response to the ALJ's dispositive hypothetical question (see Tr. 53) and adopted by the ALJ at step five of the SEP (see Tr. 30). Although Plaintiff argues that a nonproduction restriction would eliminate the box maker job (see Docket Entry 7 at 4 (citing DOT, No. 794.684-014 ("Box Maker, Paperboard"), 1991 WL 681311 (G.P.O. 4th ed. rev. 1991)), he does not assert that such a restriction would preclude the industrial cleaner and landscape specialist jobs (see id.), and the Court's review of the DOT listings for such jobs suggests that those jobs do not involve production duties, see DOT, No. 381.687-018 ("Cleaner, Industrial"), 1991 WL 673258; DOT, No. 406.687-010 ("Landscape Specialist"), 1991 WL 673342. The VE testified (and the ALJ found (see Tr. 30)) that 194,000 industrial cleaner jobs and 216,000 landscape specialist jobs existed in the national economy (see Tr. 53), numbers that clearly qualify as significant under Fourth Circuit precedent, see McCall v. Saul, 844 F. App'x 680, 681 (4th Cir. 2021) (citing with approval cases holding that 25,000 and 11,000 jobs nationally qualified as significant job numbers); Hicks v. Califano, 600 F.2d 1048, 1051 (4th Cir. 1979) ("We do not think that the approximately 110 jobs [available regionally] testified to by the [VE] constitute an insignificant number.").

Third, Plaintiff erroneously equates the consultants' moderate limitation on Plaintiff's ability to accept instructions and

14

respond appropriately to criticism from supervisors as an "inability" to do so. (Docket Entry 7 at 4 (emphasis added).) The regulations define a "moderate" limitation as meaning mental "functioning in that area independently, appropriately, effectively, and on a sustained basis is fair," 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00F.2.c (emphasis added), and not that the individual possesses no useful ability to function in that area. Consistent with that definition, the consultants found that, despite Plaintiff's moderate limitation on handling instructions and criticism from supervisors, Plaintiff could "adequately relate to others in a work setting on a casual basis." (Tr. 64, 76 (emphasis added).) The ALJ here limited Plaintiff to frequent interaction with supervisors (see Tr. 25), but - even if the ALJ should have adopted a greater limitation (i.e., occasional, brief, or superficial interaction) to encompass the consultants' restriction to "casual" interaction (Tr. 64, 76) - Plaintiff still cannot show reversible error. The DOT codes for all three jobs cited by the VE (and adopted by the ALJ at step five (see Tr. 30)) contain a fifth digit of "8" (Tr. 53 (citing DOT Nos. 794.6**8**4-014, 381.6**8**7-018, 406.6**8**7-010)), representing the lowest level of human interaction in the workplace, see Fletcher v. Colvin, No. 1:15CV166, 2016 WL 915196, at *10 (M.D.N.C. Mar. 4, 2016) (unpublished), recommendation adopted, slip op. (M.D.N.C. Mar. 28, 2016) (Osteen, Jr., C.J.).

15

In short, Plaintiff's first issue on review fails as a matter of law.

## 2. Plaintiff's Absence Rate

Next, Plaintiff contends that "[t]he ALJ erred by failing to consider [Plaintiff]'s absentee rate in concluding that jobs exist[ed] in significant numbers that [he] could perform." (Docket Entry 7 at 6 (bold font, all caps font, and block formatting omitted).) In that regard, Plaintiff maintains that "the ALJ failed to recognize the VE's opinion that work would not exist if [Plaintiff] was absentee [sic] more than 'one day a month, occasionally two days a month, but not two days every month.'" (Id. at 7-8 (quoting Tr. 54).) According to Plaintiff:

> In each year since the alleged onset date, [he] has missed more than two days in a month, in at least one month of the year, due to the impairments contained in the [r]ecord. In 2020, [he] was hospitalized for 14 days, and would therefore have been absent from work. In 2021, [he] was on 10-pound work restrictions from January 1, 2021 through January 27, 2021, and was hospitalized on three further occasions, for a total of 30 days [he] would be predicted absent from work. In 2022, [he] was hospitalized for seven days, three of which were consecutive from September 14 through September 17, 2022. The ALJ considered [Plaintiff]'s report that when he has a diverticulitis flareup, 'he stays in bed most of the time; and when he has a blockage, he can be out for two weeks at a time. [Plaintiff] reported having flares about half of every month.' On July 7, 2021, a medical provider, Matthew Smith, noted the hospital environment is 'very triggering for [Plaintiff], so he avoids the hospital at all times,' testimony [sic] which provides an independent report that [Plaintiff] may be avoiding hospitalization in favor of conservative care at home. Even without consideration for [Plaintiff]'s testimony, [he] was hospitalized or otherwise unable to perform [substantial gainful activity] for more than two days in

16

a month, <u>for at least one month per year since the</u>
<u>[alleged onset date]</u>.  The ALJ's failure to consider
this, in combination with the VE's testimony that such
absentee rate would preclude competitive employment at
any exertional level, was error.

(<u>Id.</u> at 8 (emphasis added) (citing Tr. 323, 819-20, 864, 1634,
1645, 2045, and quoting Tr. 25, 1780).)  Plaintiff further notes
that "[i]t is 'appropriate to reverse without remanding where the
record does not contain substantial evidence to support a decision
denying coverage under the correct legal standard and when
reopening the record for more evidence would serve no purpose," and
argues that "[r]eversal is merited here."  (<u>Id.</u> at 9 (quoting
<u>Breeden v. Weinberger</u>, 493 F.2d 1002, 1012 (4th Cir. 1974)).)
Those arguments fall short.

     RFC entails assessment of a claimant's ability to do <u>sustained</u>
work-related physical and mental activities in a work setting "on
a <u>regular and continuing basis</u>," 20 C.F.R. § 404.1545(b), (c)
(emphasis added), which "'means 8 hours a day, for 5 days a week,
or an equivalent work schedule,'" <u>Hines</u>, 453 F.3d at 562 (emphasis
omitted) (quoting Social Security Ruling 96-8p, <u>Titles II and XVI:</u>
<u>Assessing Residual Functional Capacity in Initial Claims</u>, 1996 WL
374184, at *2 (July 2, 1996) ("SSR 96-8p")).  In making the RFC
determination, the ALJ must take into consideration "[t]he effects
of treatment, including limitations or restrictions imposed by the
mechanics of treatment (e.g., frequency of treatment, duration,
disruption to routine, side effects of medication)."  SSR 96-8p,

1996 WL 374184, at *5. Moreover, "[a]bsenteeism due to the frequency of treatment is a relevant factor so long as the treatment is medically necessary and concerns the conditions on which the disability claim is founded." Griffin v. Commissioner of Soc. Sec., No. 2:15CV13715, 2017 WL 991006, at *2 (E.D. Mich. Mar. 15, 2017) (unpublished). Here, for the reasons that follow, Plaintiff's contention that, "[i]n each year since the alleged onset date, [he] has missed more than two days in a month, in at least one month of the year, due to the impairments contained in the [r]ecord" (Docket Entry 7 at 8 (emphasis added) (citing Tr. 323, 864)) fails to demonstrate that Plaintiff would have experienced impermissible levels of absenteeism during the relevant period.

Plaintiff's reliance on the 14 days he spent in the hospital for a small bowel resection in December 2020, and the 27 days in January 2021 he remained under his surgeon's temporary, 10- to 15-pound lifting restriction during his recovery from that surgery fails (see Docket Entry 7 at 8 (citing Tr. 819-20)) because, as discussed in more detail below, the record demonstrates that Plaintiff's condition significantly stabilized and improved following that surgery. Thus, Plaintiff has made no showing that his gastrointestinal impairments would have caused him, on an ongoing basis, to miss more than one day of work per month throughout the relevant period in this case.

Prior to his alleged onset date, from November 2018 to October 2020, Plaintiff endured a series of surgeries and unfortunate post-surgical complications stemming from his diagnosis of diverticulitis. (See Tr. 330-33, 336, 375-77, 1545-52 (11/27/18-5/14/19 outpatient diagnosis and treatment of left-sided diverticulitis in sigmoid colon with contained perforation), 414-24 (5/29-6/3/19 laparoscopic sigmoid colon resection), 432-51 (6/4-6/7/19 hospitalization for post-surgical ileus/obstruction, hospital acquired pneumonia, and sepsis), 474-503 (6/22-7/1/19 hospitalization for colon abscess, anastomotic leak, and stent placement), 558-61 (12/11-12/22/19 laparoscopic diverting loop ileostomy and revision with end ileostomy), 633-35 (6/8-6/12/20 reversal of ileostomy and lysis of adhesions), 667-93 (9/25-27/20 hospitalization for partial small bowel obstruction at anastomosis), 709-32 (10/12-10/15/20 hospitalization for partial small bowel obstruction).) In contrast, Plaintiff's medical course stabilized significantly after his alleged onset date. Just days after the onset date, he spent four days in hospital for a recurrent small bowel obstruction (see Tr. 754-815 (12/2-12/6/20 hospitalization for partial small bowel obstruction at anastomosis)), but he then transferred to UNC Hospital on December 6, 2020 (see Tr. 825-73), underwent small bowel resection on December 9, 2020 (see id.), and discharged from hospital on December 16, 2020 (see id.). Although Plaintiff remained under his

19

surgeon's restriction to lifting no more than 10 to 15 pounds until January 20, 2021, i.e., six weeks after his surgery (see Tr. 820), the record does not reveal any further surgical interventions as of the date of the ALJ's decision on April 26, 2023 (see Tr. 973-77, 1543-1654, 1633-93, 1752-77, 1860-1947, 1997-2097, 2212-311). Significantly, Plaintiff experienced only one further inpatient hospitalization related to his gastrointestinal impairments (see Tr. (9/14-9/17/22 hospitalization for partial small bowel obstruction)), for a total of two inpatient hospitalizations totaling 19 days in the 29 months between his onset date and the ALJ's decision.[8]

Those two inpatient hospitalizations, spaced nearly 19 months apart, simply do not establish that Plaintiff's gastrointestinal impairments would have caused him to miss work more than one day per month on an ongoing basis throughout the relevant period. See Shawna Kay D. v. Kijakazi, No. 21CV923, 2022 WL 2316203, at *2 (N.D. Ill. June 28, 2022) (unpublished) ("[The p]laintiff contests the ALJ's conclusion that her health-related absences would not

_____

[8] Plaintiff visited the emergency room on three other occasions since the onset date complaining of abdominal pain, but, on each occasion, imaging did not detect small bowel obstruction and the providers discharged Plaintiff on the same day. (See Tr. 973-76 (2/2/21), 1645-48 (3/22/21), 2003-005 (5/30/22).) Moreover, Plaintiff inappropriately includes emergency room visits for a fall off a roof and a bee sting – isolated medical events completely unrelated to his chronic gastrointestinal issues – in his accounting of days spent in hospital (see Docket Entry 7 at 8 (citing Tr. 2045, and referencing Tr. 2062)). See McWhorter v. Berryhill, No. 2:17CV12062, 2018 WL 4417746, at *5 (E.D. Mich. July 23, 2018) (unpublished) (rejecting the plaintiff's contention that "sheer number" of medical visits rendered her disabled, observing that many of those treatment visits "involved isolated incidents, not chronic conditions that would require ongoing treatment").

exceed the amount employers generally tolerate, i.e., one to two per month. [The p]laintiff says[] the record shows that she was hospitalized or in the ER on average more than 10 to 12 days per year since her alleged onset date. She contends, for example, that in 2019, the number of days she spent in an emergency room or hospital exceeded the twelve to twenty-four deemed acceptable by employers. But the evidence she cites shows that [she] lost, at most, <u>eight</u> days to ER visits and hospital stays in 2019. Because the record does not support [the] plaintiff's assertion that her impairments would cause her to be absent from work excessively, it is not the basis for a remand." (emphasis added) (internal parenthetical citations, quotation marks, brackets, and footnote omitted); <u>compare</u> <u>Brown v. Berryhill</u>, No. 1:17CV1096, 2018 WL 3910833, at *4 (M.D.N.C. Aug. 15, 2018) (unpublished) (Webster, M.J.) (faulting ALJ for "characteriz[ing the p]laintiff's pain and limitation from pancreatitis as not ongoing," where, "by the Court's count, [the p]laintiff was hospitalized <u>eleven</u> times and for a total of <u>fifty-four</u> days between the alleged amended onset date and the decision date[ and] visited the emergency room at least <u>nine</u> other times . . ., or <u>on average two days each month</u>." (emphasis added)), <u>recommendation adopted</u>, 2018 WL 5447699 (M.D.N.C. Sept. 5, 2018) (unpublished) (Eagles, J.).

Plaintiff appears to recognize his inability to argue, based on the existing record, that his gastrointestinal impairments would

Case 1:23-cv-00863-LPA   Document 11   Filed 08/14/24   Page 21 of 39

have caused him to miss more than one day of work per month on an
ongoing basis throughout the relevant period, because he argues,
instead, that "[he] has missed more than two days in a month, in at
least one month of the year, due to the impairments contained in
the [r]ecord" (Docket Entry 7 at 8 (emphasis added)). But, as the
United States Court of Appeals for the Eleventh Circuit recently
recognized, having one month in a year with multiple medical events
does not establish that one's impairments would cause ongoing
absence at impermissible levels. See Blackmon v. Commissioner of
Soc. Sec., No. 23-12894, 2024 WL 3495022, at *7 (11th Cir. July 22,
2024) (unpublished) ("The ALJ's decision not to include absenteeism
limitations in [the plaintiff]'s RFC is supported by substantial
evidence. . . . Looking to the time period between . . . [the
plaintiff]'s amended onset date[] and . . . [the plaintiff]'s last
documented medical event before filing[], [the plaintiff] had
medical events on only eight days, for an average of just over 1
time per 30 days. And [the plaintiff] had multiple medical events
in just one of the months between her amended onset date and her
filing, which is hardly having multiple medical events in a month
on a regular and ongoing basis." (emphasis added) (internal
quotation marks omitted)).

Plaintiff additionally relies on his testimony that he had
diverticulitis flares about half of every month (Docket Entry 7 at
8 (referencing Tr. 50)), as well as an observation by his therapist

Matthew Smith ("Therapist Smith") that Plaintiff "'avoid[ed] the hospital at all times'" because he found the hospital "'very triggering'" (id. (quoting Tr. 1780)), to suggest that he "may be avoiding hospitalization in favor of conservative care at home" (id.). Such an argument falls short for three reasons.

First, Plaintiff fails to acknowledge that the ALJ indeed considered Plaintiff's report that he "ha[d] flares about half of every month," but thereafter found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in th[e ALJ's] decision." (Tr. 25.) Plaintiff has not challenged that finding by the ALJ. (See Docket Entry 7.)

Second, the ALJ recognized that, contrary to Plaintiff's testimony claiming to experience diverticulitis flares half of the time, "[he] reported that he did well following the [small bowel resection in December 2020]" (Tr. 26 (emphasis added) (citing Tr. 819 (12/29/20) 1634 (2/2/21))), as well as that "[a] colonoscopy performed in December 2022 showed patent end-to-end colo-colonic anastomosis, characterized by health[y] appearing mucosa and normal ileum" (id. (citing Tr. 2307); see also Tr. 2230 (Plaintiff's statement to hospital provider in September 2022 that his last flare occurred two to three months prior which he managed at home with "modest bowel rest")).

23

Third, Plaintiff overstates the significance of his remark to Therapist Smith that Plaintiff finds hospitals "very triggering" and "avoids the hospital at all times." (Docket Entry 7 at 8 (quoting Tr. 1780).) The complete context of the remark, made on July 7, 2021, follows:

> [Plaintiff] stated he is having difficulties staying asleep due to racing thoughts and this is making it difficult to manage his stress and anxiety. [Plaintiff] wants to get consistent restful sleep first so he can better focus on using his stress/anxiety management strategies. He added that the possibility of a sleep study was presented to him but since the study would be at the hospital but [sic] that environment is very triggering for him, so he avoids the hospital at all times.

(Tr. 1780.) At best, that statement suggests that Plaintiff might not schedule <u>elective</u> procedures due to the "triggering" nature of hospitals, but the record shows that Plaintiff continued to present at emergency rooms when he believed his symptoms warranted such an intervention (<u>see</u> Tr. 2045-60 (11/18/21), 2061-68 (4/7/22), 2069-78 (5/30/22), 2213-44 (9/14-9/17/22)).

Put simply, Plaintiff has not shown that the ALJ erred by failing to consider Plaintiff's absentee rate during the relevant period and thus his second assignment of error lacks merit.

### 3. Opinions of Dr. Gainey

Plaintiff's third and final assignment of error maintains that "[t]he ALJ failed to comply with 20 [C.F.R.] § 404.1520[c] in not according adequate weight to the opinions of Dr. [] Gainey, Plaintiff's treating physician [sic]." (Docket Entry 7 at 9 (bold

24

font, all caps font, and block formatting omitted).) More specifically, Plaintiff notes that Dr. Gainey's opinion that Plaintiff could not "maintain gainful employment because his conditions affect his concentration, productivity, and ability to perform job duties . . . is meaningfully supported by the evidence in the record." (Id. (citing Tr. 965).) In particular, Plaintiff contends that Dr. Gainey's opinions harmonize with "a work activity questionnaire" from Plaintiff's last employer reflecting that Plaintiff needed workplace accommodations to perform his job as a motorcycle mechanic (id. at 10 (citing Tr. 182)), as well as with the opinions of the state agency psychological consultants, who each "found the same or similar limitations" as Dr. Gainey in various areas of mental functioning (id. at 12 (citing Tr. 64)). Additionally, Plaintiff accuses the ALJ of "selectively" citing evidence that supported his decision to discount Dr. Gainey's opinions, while ignoring other evidence that favored Dr. Gainey's opinions. (Id. at 10 (citing Tr. 28, 713-15, 727, 759, 764); see also id. at 10-11 (detailing other examples of ALJ's alleged selectivity (citing Tr. 678, 826-28, 1491, 1497, 1702, 1780-82).) According to Plaintiff, as a result of the ALJ's errors in evaluating Dr. Gainey's opinions, "[r]eversal is merited here." (Id. at 13.) As the following analysis shows, those contentions do not establish prejudicial error by the ALJ.

25

For benefits applications filed on or after March 27, 2017 (such as Plaintiff's (see Tr. 176-78, 183-86)), the SSA has enacted substantial revisions to the regulations governing the evaluation of opinion evidence, see Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017).  Under the new regulations, ALJs need not assign an evidentiary weight to medical opinions or accord special deference to treating source opinions.  See 20 C.F.R. § 404.1520c(a) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . ., including those from [a claimant's] medical sources").  Instead, an ALJ must determine and "articulate in [the] . . . decision how persuasive [he or she] find[s] all of the medical opinions . . . in [a claimant's] case record."  20 C.F.R. § 404.1520c(b) (emphasis added).  Moreover, when a medical source provides more than one opinion, the ALJ can evaluate the persuasiveness of such opinions "together in a single analysis" and need not articulate how he or she considered those opinions "individually."  20 C.F.R. § 404.1520c(b)(1).

In evaluating the persuasiveness of an opinion, the SSA deems supportability and consistency "the most important factors" and thus the ALJ must address those two factors in evaluating the

persuasiveness of an opinion.  20 C.F.R. § 404.1520c(b)(2).[9]  The ALJ must address the three other persuasiveness factors — the nature and extent of the medical source's relationship with the claimant and area of specialization, as well as the catch-all "other factors that tend to support or contradict" the opinion, 20 C.F.R. § 404.1520c(c)(3)-(5) — only when the ALJ finds two or more opinions about the same issue "[e]qually persuasive" in terms of supportability and consistency, 20 C.F.R. § 404.1520c(b)(3).

Dr. Gainey submitted an undated letter addressed "To Whom It May Concern," which provides, in pertinent part, as follows:

> [Plaintiff] is under my care for the treatment of chronic mental illness.  He is being treated for Post-Traumatic Stress Disorder, Generalized Anxiety Disorder, and Panic Disorder.  [He] has been seen in our office since 7/12/2019 for medication management and has been compliant with keeping his scheduled appointments.
>
> Due to [his] mental illness, in my professional opinion, [he] is not at able [sic] to maintain gainful employment.  [His] condition is chronic and affects his ability to perform job duties requiring effective communication, concentration, and productivity.  He has excessive fears and anxiety that prohibit him from leaving the house and performing job duties.  [His] mental illness affects his everyday life in all areas of his life.  It is my professional opinion that [he] be considered for full disability benefits due to his chronic mental illness.

---

[9] "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation."  Revisions to Rules, 82 Fed. Reg. at 5853; see also 20 C.F.R. § 404.1520c(c)(1).  "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim."  Revisions to Rules, 82 Fed. Reg. at 5853; see also 20 C.F.R. § 404.1520c(c)(2).

(Tr. 965.) Dr. Gainey attached to that letter a preprinted form entitled "MENTAL STATUS FUNCTIONAL CAPACITY" prepared by Plaintiff's attorney (see Tr. 964 ("advis[ing] that this form was created by our office")), which Dr. Gainey dated January 29, 2021, and on which she opined that Plaintiff's "Generalized Anxiety, Panic Attacks and Major Depression" resulted in "[s]ignificant" restriction in his "[a]bility to relate to other people," "[r]estriction of daily activities," "[d]eterioration of personal habits," and "[c]onstriction of interests" (Tr. 966). Dr. Gainey further stated that Plaintiff's mental impairments caused "[n]one or [s]light" limitation on Plaintiff's abilities to "[u]nderstand simple instructions" and [c]arry out instructions under normal supervision," "[s]ignificant" limitation on his ability to "[s]ustain work performance, attendance," and "[m]arked" limitation on his ability to "[c]ope with pressures of ordinary work." (Id.)[10] Dr. Gainey described Plaintiff's symptoms as "worsening anxiety [and] panic attacks, [i]ncreased outbursts, excessive worrying,

_____

[10] The preprinted form defined "[n]one or [s]light" limitation as "[n]o significant limitations," "[s]ignificant" as "[a]n impairment which seriously interferes with the individual's ability to perform work activity on a regular basis, i.e., 1-3 hours out of an 8 hour day, 5 days per week, or an equivalent work schedule," and "[m]arked" as "[a]n impairment which precludes the individual's ability to function independently, appropriately, and effectively on a regular basis, i.e., 4 or more hours out of an 8 hour day, 5 days per week, or an equivalent work schedule." (Tr. 966.)

Case 1:23-cv-00863-LPA   Document 11   Filed 08/14/24   Page 28 of 39

difficulty concentrating, [and] inability to perform job duties."
(Id.)[11]

The ALJ summarized Dr. Gainey's above-described opinions (see Tr. 28), and thereafter provided the following persuasiveness analysis:

> The [ALJ] does not find this opinion persuasive. The record indicates that [Plaintiff] received benefit from medications and had improvements with regard to anxiety and panic attacks. ([Tr. 1491, 1792, 1818, 1830, 2106]).[12] Additionally, this opinion is inconsistent with the largely normal mental status findings including logical thought process, normal thought content, fair insight, normal recent and remote memory, normal attention span and concentration ability, good eye contact, and well groomed. ([Tr. 671, 682, 688, 710, 718, 760, 768, 774, 1495, 1499, 1503, 1508, 1712, 1722, 1782, 1786, 1792, 1798, 1804, 1812, 1818, 1824, 1830, 1848, 1855, 1960, 2100, 2102, 2105, 2107, 2151, 2154, 2164, 2319]).

(Tr. 28 (emphasis added).)

That analysis by the ALJ of Dr. Gainey's opinions makes clear he considered both the supportability and the consistency of her opinions as required by Section 404.1520c(b)(2). With regard to supportability, i.e., "[t]he extent to which a medical source's

_____

[11] As the Commissioner notes, "[i]n January 2023, Dr. Gainey filled in a few portions of a psychiatric review technique form ('PRTF'), leaving it mostly blank without any explanation (Tr. 2326-40)." (Docket Entry 9 at 13 n.3.) On the PRTF, Dr. Gainey "checked off various symptoms of [Listings] 12.04 and 12.06, but nothing else – not even Plaintiff's degree of limitation under the [] paragraph B criteria (Tr. 2329, 2331, 2338)." (Id. at 13-14 n.3.) Although the ALJ cited to the PRTF in his evaluation of Dr. Gainey's opinions (see Tr. 28 (citing Tr. 2326-40)), Plaintiff did not argue that the ALJ erred in his consideration of the PRTF (see Docket Entry 7 at 9-13). Accordingly, the undersigned will not address the PRTF further.

[12] Although the ALJ cited to page 49 of Exhibit 24F in this string cite (Tr. 28 (citing "Exhibit 24F/49")), Exhibit 24F ends with page 34 (see Tr. 789).

29

opinion is supported by relevant objective medical evidence and the source's supporting explanation," Revisions to Rules, 82 Fed. Reg. at 5853; see also 20 C.F.R. § 404.1520c(c)(1), the ALJ noted that Dr. Gainey's own records (and those of Therapist Smith, who provides care at the same practice as Dr. Gainey) showed that "[Plaintiff] received benefit from medications and had improvements with regard to anxiety and panic attacks." (Tr. 28 (citing Tr. 1491, 1792, 1818, 1830, 2106).) Concerning consistency, i.e., "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim," Revisions to Rules, 82 Fed. Reg. at 5853; see also 20 C.F.R. § 404.1520c(c)(2), the ALJ observed that Dr. Gainey's opinions lacked consistency "with the largely normal mental status findings" found by Plaintiff's various treatment providers throughout the relevant period. (Tr. 28 (citing Tr. 671, 682, 688, 710, 718, 760, 768, 774, 1495, 1499, 1503, 1508, 1712, 1722, 1782, 1786, 1792, 1798, 1804, 1812, 1818, 1824, 1830, 1848, 1855, 1960, 2100, 2102, 2105, 2107, 2151, 2154, 2164, 2319).)

Plaintiff attempts to undermine the ALJ's finding that Dr. Gainey's opinions lacked consistency with other record evidence by arguing that the ALJ failed to acknowledge the extent to which a work activity form from Plaintiff's last employer supported Dr. Gainey's opinions. (See Docket Entry 7 at 10 (citing Tr. 182).) In that regard, Plaintiff notes that the form "indicat[es] that

30

[Plaintiff] was 'frequently absent from work,' that he did not regularly report for work as scheduled, and that the employer gave special assistance to [Plaintiff] in the form of 'fewer or easier duties, less hours, frequent absences' and 'lower production standards.'" (Id. (quoting Tr. 182).)

Plaintiff's argument glosses over the facts that 1) the employer offered Plaintiff those alleged workplace accommodations during a time primarily pre-dating Plaintiff's onset date (see Tr. 199 (indicating Plaintiff "became sick 5/11/19" and lost his job on "2/5/21"), 181 (describing Plaintiff's employment as "stop [and] go since 2019")) when, as discussed above in the context of Plaintiff's second issue on review, Plaintiff experienced a series of gastrointestinal surgeries and post-surgical complications, including anastomotic leak, abscess, sepsis, pneumonia, and recurrent small bowel obstructions caused by post-surgical adhesions (see Tr. 330-33, 336, 375-77, 414-24, 432-51, 474-503, 558-61, 633-35, 667-93, 709-32, 754-815, 1545-52); and 2) Plaintiff's condition stabilized and improved significantly following his December 2020 small bowel resection (see Tr. 825-73, 973-77, 1543-1654, 1633-93, 1752-77, 1860-1947, 1997-2097, 2212-311). Moreover, as the Commissioner points out, the Plaintiff performed the skilled, heavy-exertion job of motorcycle mechanic for his last employer (see Tr. 29, 52, 181) and, thus, the fact that Plaintiff needed accommodations for that job has little

31

probative value to show he would need those accommodations to perform the medium-exertion, unskilled jobs cited by the VE (see Tr. 53) and adopted by the ALJ at step five of the SEP (see Tr. 30).

Plaintiff further maintains that the ALJ overlooked that the state agency psychological consultants each "found the same or similar limitations" as Dr. Gainey on Plaintiff's "'ability to maintain attention and concentration for extended periods; [] ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; [] ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; [] ability to interact appropriately with the general public; [] ability to accept instructions and respond appropriately to criticism from supervisors;' and '[] ability to respond appropriately to changes in the work setting.'" (Id. at 12 (quoting Tr. 64).)

As an initial matter, the regulations define the terms "moderate" and "marked" as used by the consultants differently than the form crafted by Plaintiff's attorney defines "[s]ignificant" and "[m]arked." Compare 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00F.2.c, d (defining "[m]oderate limitation" as reflecting that "functioning in this area independently, appropriately,

32

effectively, and on a sustained basis is _fair_," and "[m]arked limitation" as reflecting that "functioning in this area independently, appropriately, effectively, and on a sustained basis is _seriously limited_" (emphasis added)), _with_ Tr. 966 (defining "[s]ignificant" as "[a]n impairment which _seriously_ interferes with the individual's ability to perform work activity on a regular basis, i.e., 1-3 hours out of an 8 hour day, 5 days per week, or an equivalent work schedule," and "[m]arked" as "[a]n impairment which _precludes_ the individual's ability to function independently, appropriately, and effectively on a regular basis, i.e., 4 or more hours out of an 8 hour day, 5 days per week, or an equivalent work schedule" (emphasis added)). Such substantial differences in the rating scales make suggestions of meaningful symmetry between the opinions of the consultants and those of Dr. Gainey untenable. More importantly, the consultants found, at most, _moderate_ limitations on Plaintiff's ability to perform mental work-related activities (_see_ Tr. 61, 64, 72, 76) and opined that he remained _capable of a range of SRRTs_ (_see_ Tr. 62, 77), whereas Dr. Gainey believed Plaintiff's mental impairments caused "[m]arked" limitation in his ability to tolerate work pressure (Tr. 966), which equated to an _inability_ to tolerate such pressure per the form's definition (_see id._), and found him _disabled_ by his mental symptoms (_see_ Tr. 965).

33

Plaintiff's contention that the ALJ "selectively" cherrypicked the evidence that contradicted Dr. Gainey's opinions (Docket Entry 7 at 10-11) fares no better, for the following three reasons. First, as a general matter, a review of the transcript pages cited by the ALJ reveals that he considered mental status examinations by a full range of Plaintiff's providers throughout the relevant period, e.g., emergency room physicians, consulting surgeons, Dr. Gainey, Therapist Smith, and two other medical providers at the same practice as Dr. Gainey and Therapist Smith, as well as records dating from approximately two months prior to the alleged onset date to the second to last mental health treatment note in the record dated just over four months prior to the ALJ's decision. (Tr. 28 (citing Tr. 671, 682, 688, 710, 718, 760, 768, 774, 1491, 1495, 1499, 1503, 1508, 1712, 1722, 1782, 1786, 1792, 1798, 1804, 1812, 1818, 1824, 1830, 1848, 1855, 1960, 2100, 2102, 2105-07, 2151, 2154, 2164, 2319).) Such a comprehensive review of the record evidence undermines Plaintiff's claim the ALJ "selectively" relied on evidence inconsistent with Dr. Gainey's opinions.

Second, Plaintiff's criticism that the ALJ over-relied on normal mental status examinations in notes reflecting "treatment . . . for a gastrointestinal (non-mental) condition" (Docket Entry 7 at 10 (citing Tr. 678); see also id. at 11 ("the ALJ located records within Exhibit 29F which were primarily concerned with treatment of [] diverticulitis" and "cit[ed] other

34

records focusing on diverticulitis" in Exhibit 32)) ignores the fact that Plaintiff himself identified the multiple hospitalizations, surgeries, and complications caused by his gastrointestinal impairments as the cause of his mental symptoms (see Tr. 46 (linking his depression, anxiety, and PTSD to his "diverticulitis" and "multiple surgeries"), 1724 (remarking that he worries "excessively" about bowel obstructions), 1780 (describing hospitals as "very triggering")). Thus, the ALJ did not err by noting that mental status examinations remained normal even when providers examined Plaintiff during those hospitalizations for gastrointestinal issues because of the interrelationship of those physical impairments and his mental impairments.

Third, Plaintiff's specific examples of evidence the ALJ "selectively" avoided fails to demonstrate grounds for remand. In that regard, Plaintiff faults the ALJ for not expressly discussing notations allegedly supportive of Dr. Gainey's opinions in records otherwise cited by the ALJ, such as a description of Plaintiff's mood as "'depressed'" (Docket Entry 7 at 10 (quoting Tr. 727)), a "request[]" that Plaintiff "follow-up with Dr. [] Gainey" (id. (citing Tr. 713)), diagnoses of "'[a]nxiety and depression'" along with a notation that Plaintiff should continue his "'Cymbalta, buspirone and p.r.n. lorazepam'" (id. (quoting Tr. 764)), an order of "'[intravenous] Ativan prn anxiety'" (id. (quoting Tr. 678)), and "anxiety and depression bolded by the medical providers" with

35

a notation that Plaintiff "'feels that these obstructions are increasing in frequency . . . and reports that this has caused him to miss a significant amount of work and is affecting his lifestyle" along with an order for "'Ambien'" and "'Ativan'" for "'[a]nxiety'" (id. at 10-11 (quoting Tr. 826-28)).  Plaintiff additionally asserts that the ALJ "selectively avoided citing" Dr. Gainey's "observ[ation of] depression, anxiety, nervousness, [and] sleep disturbance," and "'[s]ymptoms includ[ing] sweating, shakiness, chest tightness, [shortness of breath] and crying with panic attacks lasting 30 minutes to 1 hour'" (id. at 11 (quoting Tr. 1491)), and Therapist Smith's notation that Plaintiff "was 'having difficulties staying asleep due to racing thoughts and th[at wa]s making it difficult to manage his stress/anxiety'" (id. (quoting Tr. 1780)).

   To begin, the ALJ need not explicitly discuss every finding in every piece of evidence in the record, see Reid v. Commissioner of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014), but, rather, "must both identify evidence that supports his conclusion and build an accurate and logical bridge from that evidence to [that] conclusion," Woods v. Berryhill, 888 F.3d 686, 694 (4th Cir. 2018) (internal emphasis, quotation marks, and brackets omitted).  As explained above, the ALJ cited to a full range of evidence from the record supporting his decision to discount Dr. Gainey's opinions.

More significantly, Plaintiff has not shown how the ALJ's express consideration of any of the evidence he cites would have led to a more favorable result in his case. Given that the ALJ found that Plaintiff had severe <u>anxiety disorder</u> and <u>depressive disorder</u> at step two of the SEP (<u>see</u> Tr. 22), that resulted in RFC limitations to simple instructions, frequent interaction with supervisors and co-workers, no interaction with the general public, and infrequent and gradual workplace changes (<u>see</u> Tr. 24-25), as well as acknowledged Plaintiff's reported mental symptoms, periods of both worsening and improving mental symptoms, and his psychiatric medications (<u>see</u> Tr. 27), the notations in hospital records Plaintiff cites which list anxiety and depression diagnoses, reflect intravenous administration of anxiety medication, confirm home psychiatric medications, and advise follow-up with Plaintiff's mental health care providers (<u>see</u> Docket Entry 7 at 10-11 (citing Tr. 678, 727, 826-28)), would not have compelled the ALJ to include additional limitations in the RFC.

Moreover, Plaintiff's assertion that the ALJ "selectively avoided citing" Dr. Gainey's "observ[ation of] depression, anxiety, nervousness, [and] sleep disturbance," and "'[s]ymptoms includ[ing] sweating, shakiness, chest tightness, [shortness of breath] and crying with panic attacks lasting 30 minutes to 1 hour'" (<u>id.</u> at 11 (quoting Tr. 1491)) fails, because Dr. Gainey did not "observe[]" those symptoms; rather, she recorded Plaintiff's <u>subjective</u> report

37

of having those symptoms (see Tr. 1491).[13]  Similarly, Therapist Smith did not observe Plaintiff experiencing "racing thoughts" or difficulty sleeping but, rather, recorded Plaintiff's subjective report of experiencing those symptoms.  (See Tr. 1780); see also Craig, 76 F.3d at 590 n.2 ("There is nothing objective about a doctor saying, without more, 'I observed my patient telling me she was in pain.'").  Furthermore, the ALJ expressly recognized that Plaintiff "alleged mental symptomology, including flashbacks, racing thoughts, tense stomach, decreased energy, lack of motivation, panic attacks, insomnia, and emotional numbness" (Tr. 27 (emphasis added)), but found Plaintiff's "statements concerning the intensity, persistence and limiting effects of th[o]se symptoms [] not entirely consistent with the medical evidence and other evidence in the record" (Tr. 25), a finding not challenged by Plaintiff (see Docket Entry 7).

In sum, the ALJ's decision permits the Court to trace the path of the ALJ's reasoning in finding Dr. Gainey's opinions not persuasive, and, thus, Plaintiff's third issue on review fails to establish a basis for reversal or remand.

_____

[13] Plaintiff accuses the ALJ of "selectively avoid[ing] citing [a] February 25, 2021 record" from Dr. Gainey (Docket Entry 7 at 11 (citing 1491)); however, the ALJ did cite that record, appropriately, as support for the proposition that "[Plaintiff] received benefit from medications and had improvements with regard to anxiety and panic attacks" (Tr. 28 (citing, inter alia, Tr. 1491); see also Tr. 1491 (reflecting Plaintiff's statements that his symptoms "[we]re currently somewhat improving," that his "mood [was] improving," that he was "[f]eeling less depressed and [had] increased motivation,", that he was "able to stay more focused since starting Abilify," that his "[a]nxiety [was] manageable," and that he was "[n]o longer isolating [him]self")).

## III. CONCLUSION

Plaintiff has not established an error warranting relief.

**IT IS THEREFORE ORDERED** that the Commissioner's decision finding no disability is **AFFIRMED,** that Plaintiff's Motion for Summary Judgment (Docket Entry 6) is **DENIED,** and that this action is **DISMISSED** with prejudice.


　　　　　　　　　　　　　　　　　/s/ L. Patrick Auld
　　　　　　　　　　　　　　　　**L. Patrick Auld**
　　　　　　　　　　　**United States Magistrate Judge**

August 14, 2024

39